## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TODRICK W. ARRINGTON, JR., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:22-cv-226 |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW J. GUSTAFSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

**Susan Paradise Baxter, United States District Judge**

In July of 2020, Plaintiff Todrick W. Arrington, Jr. ("Arrington") was arrested by City of Erie police officers and charged with criminal mischief and riot. While awaiting trial, Arrington was detained at the Erie County Prison ("ECP"). He was eventually tried and acquitted on both charges. This civil rights lawsuit followed.

Currently pending before the Court is a motion for summary judgment filed by Lieutenant Shawn Bolt ("Bolt"),[1] Officer Michael Beganics ("Beganics"), Officer Ryan Tarasovich ("Tarasovich"), and Officer Adam Johnston ("Johnston"). ECF No. 39. Each of these movants was employed at ECP during times relevant to Arrington's confinement. For the reasons that follow, the pending motion will be granted in part and denied in part.

### I.    Factual and Procedural Background

Arrington's First Amended Complaint (ECF No. 3), the operative pleading in this case, asserts the following facts. On May 30, 2020, a peaceful protest was held in the City of Erie in

---

[1] Defendant Bolt's rank is now Captain but, because he was identified as "Lieutenant Bolt" in the operative pleading and Rule 56 filings, the Court will continue to use that title.

connection with the Black Lives Matter movement. ECF No. 3, ¶15. At some point later that day, members of the crowd became disruptive and caused damage to certain property in downtown Erie. *Id.* ¶16. Among other things, three double parking meters located on the 600 block of State Street were knocked over and dislodged from their bases. *Id.* ¶18.

Arrington was not present at the Black Lives Matter rally, nor was he present in the area of the damaged parking meters on May 30-31, 2020. ECF No. 3, ¶18. Instead, during that timeframe, Arrington was at a family member's house where he was then residing and/or was with a friend by the name of Daeojzhanae Nobel. *Id.* ¶19.

On May 31, 2020, Erie police detective Matthew Gustafson ("Gustafson") was assigned the investigation of the damaged parking meters in downtown Erie. ECF No. 3, ¶20. During the course of his investigation, Gustafson viewed a video posted on social media as well as a video obtained from the Erie police vice department, both of which apparently depicted events occurring in the City of Erie on May 30, 2020. *Id.* ¶¶21, 23. The former video included audio of a loud noise, followed by the brief depiction of a black male wearing a COVID mask, a green hoodie, and "camo" pants. *Id.* ¶21. The video did not reveal the source of the loud noise or portray any damaged parking meters. *Id.* ¶22. After cross-referencing the social media video with the video obtained from the police vice department, Gustafson obtained what was purportedly a still photo of the black male in question, without the COVID mask covering his face. *Id.* ¶24.

Seeking to identify the black male in the photo, Gustafson circulated the photo among various police personnel. ECF No. 3, ¶25. Officer Jerry Stevens ("Stevens") indicated that he believed the individual to be Arrington. *Id.* ¶26. Gustafson then contacted Erie County probation officer Alex Kissel ("Kissel"), who was at that time Arrington's supervising officer.

*Id.* ¶¶14, 27.  Gustafson inquired whether the individual depicted in the photo was Arrington, and Kissel indicated that he believed it was.  *Id.* ¶27.  Kissel then made a similar inquiry of his supervisor, Ashley Clark ("Clark").  *Id.* ¶28.  Clark confirmed that the individual pictured was Arrington, despite having no knowledge of Arrington's appearance.  *Id.*

Since at least 2018, Arrington has had a tattoo of a crown that he claims is clearly visible on the top of his right hand and wrist.  ECF No. 3, ¶29.  No such tattoo is present on the right hand of the individual pictured in the still photo that Gustafson obtained during his investigation.  *Id.* ¶30.  Nevertheless, on the basis of the mistaken identification, Gustafson obtained a warrant for Arrington's arrest.  *Id.* ¶32.

After being arrested, Arrington was taken to ECP, where he remained in pretrial detention for more than a year, despite his repeated protestations of innocence.  ECF No. 3, ¶¶33-35.  According to Arrington, the video evidence and his alibi witness should have exonerated him, but his communications were "completely ignored by all personnel at the Erie County Prison, the City of Erie Police Department, and the Erie County District Attorney's Office."  *Id.* ¶35.  He claims that, during the course of his detention at ECP, he was repeatedly subjected to cruel and unusual punishment.  *Id.*, ¶44.

In August 2021, Arrington was tried and acquitted on all charges.  ECF No. 3, ¶43.  Following his acquittal and release from detention, Arrington filed the instant lawsuit.  His Amended Complaint originally included nine counts.  ECF No. 3.  However, based on this Court's September 5, 2023 ruling, certain claims have been dismissed, leaving only the following:

- a Fourteenth Amendment due process claim against Gustafson and Stevens predicated on the alleged fabrication of evidence (Count 1);

- a Fourth Amendment false arrest/ false imprisonment claim against Gustafson and Stevens (Count 3);

- a Fourteenth Amendment due process claim against Kissel and Clark predicated on the alleged fabrication of evidence (Count 4);

- a Fourth Amendment malicious prosecution claim against Gustafson and Stevens (Count 6); and

- a Fourteenth Amendment deliberate indifference claim against four John Doe prison officials, later identified as Beganics, Tarasovich, Johnston, and Bolt (Count 9).

*See* ECF Nos. 15, 16, 20.

On November 3, 2023, Defendants Beganics, Tarasovich, Johnston, and Bolt (hereafter, "ECP Defendants" or "Moving Defendants") filed a motion to dismiss Count 9 of the Amended Complaint. ECF No. 24, 25. Arrington responded to that motion on December 18, 2023. ECF No. 29.

Thereafter, the ECP Defendants sought leave to supplement their motion with certain video evidence. ECF No. 30. The Court granted that request and converted the original motion to dismiss into a motion for summary judgment. *See* ECF Nos. 33, 34. The parties were given an opportunity to engage in additional discovery and, on August 2, 2024, the Court dismissed the ECP Defendants' initial motion without prejudice to be filed anew as a Rule 56 motion. ECF No. 35, 37.

On October 4, 2024, the ECP Defendants filed their pending motion for summary judgment relative to Count 9 of the Amended Complaint. ECF No. 39. Because only Count 9 is presently at issue, the Court focuses its discussion on that claim.

The First Amended Complaint

In the Amended Complaint, Arrington alleged that he was mistreated and exposed to cruel and unusual punishment by "John Doe" prison officials during the course of his

confinement at ECP. ECF No. 3, ¶44. Specifically, Arrington claimed that the conditions of his

detention constituted deliberate indifference to his health and safety in that he was:

a. placed in a cell with another inmate "when prison officials knew that this would result in physical assault and harm" to him;

b. required to spend 23 out of every 24 hours isolated in confinement along with other denial of basic and necessary human needs during his detention;

c. ignored with respect to his need for medical and psychological treatment, even though "the deliberate indifference of prison officials is what caused the physical and mental harm in the first place";

d. ridiculed, abused and mistreated on multiple occasions;

e. targeted and singled out for harsher treatment as compared to other prisoners;

f. treated in this manner despite prison staff's knowledge of his innocence and full awareness of exculpatory evidence; and

g. otherwise denied humane treatment or . . . treated in a manner that resulted in unnecessary infliction of pain and suffering.

*Id.* ¶90(a)-(g).

<u>The Amendment Substituting the Moving Defendants for the John Doe Defendants</u>

On October 23, 2023, Arrington filed an amendment to his operative pleading in which

he substituted the Moving Defendants for the "John Doe" Defendants. ECF No. 20. In this

pleading, Arrington offered more specific averments concerning the personal involvement of

each Moving Defendant.

In particular, Arrington claimed that Lieutenant Bolt strip-searched and berated him

shortly after he arrived at ECP and as he was being placed in the restrictive housing unit. ECF

No. 20, ¶5(a). Both during and after the strip-search, Bolt allegedly ridiculed and tried to

intimidate Arrington. *Id.* Bolt also was allegedly involved in moving Arrington from an

observation cell in the restrictive housing unit to a cell occupied by Inmate Damien Brown,

despite Arrington's repeated requests that he not be placed in a cell with Brown for fear that his life would be in danger. *Id.* ¶5(b). Arrington states that he was in fact assaulted by Brown and hit his head on the concrete wall and floor, resulting in facial bruises, head injuries, lacerations and cuts. *Id.*

Like Lieutenant Bolt, Officer Tarasovich was allegedly involved in housing Arrington with Damien Brown. Arrington avers that, "[f]or no valid penal rationale and ignoring the specific safety concerns expressed by [him], Officer Tarasovich placed [him] in the cell [with Inmate Brown] and allowed [him] to be assaulted by [Brown]." ECF No. 20, ¶6(b). Arrington claims that Tarasovich did this, despite Brown expressing "fear of his life," and despite the availability of an empty cell directly next to Brown's cell. *Id.* ¶6(a).

Officer Johnston allegedly "stood and witnessed the assault by Damien Brown . . . and did nothing to stop the assault, . . . allow[ing] Mr. Brown to repeatedly assault [Arrington] and bang his head off the concrete wall and floor." ECF No. 20, ¶7(a). Then, when Arrington complained about the fact that Johnston did nothing to prevent the assault, Johnston allegedly "wrote up false misconduct reports intentionally designed to make Mr. Arrington's prison stay more difficult and more unsafe." *Id.* ¶7(b).

Officer Beganics also allegedly failed to protect him from Brown's assault and failed to allow Arrington to protect himself, resulting in severe injuries. ECF No 20, ¶4(a). In addition, Beganics allegedly assaulted Arrington himself, by shoving Arrington's head into the wall and forcefully pushing his face into the wall on October 4, 2020. *Id.* ¶4(b). And, on July 2, 2020 when Arrington was being escorted into the prison, Beganics allegedly ridiculed and insulted him, "exhibit[ing] knowledge of the videotape and other evidence that were not available to the public." *Id.* ¶4(c).

<u>The Rule 56 Record</u>

The evidence submitted by the parties in their Rule 56 filings reveals the following.[2] At some point prior to November 4, 2020, Arrington was moved to the RHU based on a misconduct report that Arrington claims was intentionally falsified. ECF No. 44, ¶¶3-4. According to Arrington, Defendants Tarasovich, Johnston, and Beganics treated him "roughly" while transporting him to the RHU and forced him to undergo a strip search. *Id.* ¶4. During this incident, Beganics "forced [Arrington's] head against a wall." *Id.*

After leaving his observation cell in the RHU, Arrington was escorted up the stairs by Defendants Johnston and Tarasovich, who informed him that he would be placed in a cell with Damien Brown. ECF No. 44, ¶5. Arrington knew Brown to be "a violent and racist inmate," and he asked the officers to not place him in the same cell with Brown. Id. Arrington is five feet, eight inches tall and weighs 170 pounds. *Id.* ¶1. He informed Johnston and Tarasovich that he feared for his life and safety and would be beaten and assaulted if placed in a cell with Brown. *Id.* ¶7. In response, Johnston and Tarasovich laughed and said, "You're big and strong, you can handle it." *Id.* ¶8. Throughout the time that Arrington was housed with Brown, a nearby cell remained vacant and available; yet Arrington was not moved there. *Id.* ¶10.

On November 4, 2020, Arrington and Brown were involved in a physical altercation within their cell. Arrington states that he was lying in his bed when he was "violently and repeatedly punched in the head and face by Brown." ECF No. 44, ¶12. Arrington was instructed to get down on the ground while Brown continued to beat him. *Id.* In order to protect himself,

---

[2] The facts discussed herein are derived from the Defendants' Concise Statement of Material Fact (ECF No. 41), Plaintiff's response thereto and counter statement of additional facts (ECF No. 45), Plaintiff's affidavit (ECF No. 44), Defendants DVD Exhibits A and C (see ECF No. 42), the affidavits of Defendants Johnston and Bolt, and the affidavit of Deputy Warden Gary Seymour (see ECF No. 39-3, 39-5, 39-6).

Arrington "had to rise up and try to control inmate Brown[.]" *Id.* "[T]his continued for approximately the next 45 to 50 seconds with Officer Johnston staring into the cell with a grin on his face and allowing the assault to continue." *Id.* Arrington claims that, once he and Brown were both on the ground and the assault had ended, he (Arrington) was moved to the other side of the RHU. *Id.* ¶13.

Both Defendant Johnston and Defendant Bolt were wearing body cameras on the date of the incident. The summary judgment record includes video that was recorded from each of their "bodycams." The Court has reviewed this footage and notes the following.

The Moving Defendants' Exhibit "C" is the bodycam video footage recorded by Defendant Johnston. The video shows that, around the 11:10:20 mark, Johnston begins moving toward Arrington's cell in response to what sounds like an argument. At approximately 11:10:39, he arrives at the cell and immediately addresses the two cellmates, stating, "What are you guys doing? Hey guys, guys! Get in there...." By 11:10:47, Johnston is alerting prison staff of the situation with the radio message: "All staff, code 1-E2, all staff, code 1-E2." Johnston then continues to address Arrington and Brown, who are off screen, repeatedly instructing them to "knock it off" and "get on the floor." Meanwhile, another officer arrives on scene at approximately 11:11:11, and it appears that one of them begins unlocking the cell while Johnston continues issuing instructions. At approximately 11:11:41, Johnston and the second officer begin entering Arrington's cell, and Johnston then immediately handcuffs Brown. By 11:11:55, Brown is handcuffed while multiple other officers arrive on scene. Johnston can be heard suggesting that the officers move Arrington "next door and call it a day." Johnston then proceeds to a locker area and secures a bin, and the video concludes at 11:14:02.

The Moving Defendants' Exhibit "A" is the bodycam video recorded by Defendant Bolt. It spans a little less than seven minutes, beginning at 15:20:08 and ending at 15:26:58. It is not clear whether the times displayed in Exhibit "A" are in sync with the times displayed in Exhibit "C." In any event, the video from Defendant Bolt's bodycam depicts officers escorting Arrington from his cell after the assault incident terminated. Arrington is taken to a room where he is examined by medical personnel approximately two minutes after leaving his cell. Arrington is asked what happened, and he responds that he was singing "real low" and his cellmate "started nagging about the next-door neighbor." Medical personnel observe that Arrington was punched around the area of his left eye and on the top right area of his head. The examining personnel indicate that the wounds do not require stitches. When questioned, Arrington denies being punched in the mouth and denies feeling dizzy. When asked if he struck his bed or the wall, he responds that he cannot say because the incident happened so fast. Arrington's pulse is taken, he is asked to state his name and date of birth, and he is informed that he will receive ice and "neuro" checks. He can be heard stating that he is "alright." He is then escorted to a different cell, away from Inmate Brown.

Included in the Moving Defendants' Rule 56 exhibits is an affidavit from ECP Deputy Warden Gary Seymour. In this affidavit, Mr. Seymour attests to the following:

- a fight occurred between Arrington and Inmate Brown on November 4, 2020, while they were housed together in the same cell in the Restricted Housing Unit;

- Arrington's prison file does not include any record of a request made by him, prior to the November 4, 2020 altercation, to be kept separate from Inmate Brown or to be moved to another cell due to an expressed safety concern;

- no order to keep Arrington and Brown separate existed prior to the November 4, 2020 altercation; and

- roll call records from November 4, 2020 indicate that Defendants Beganics and
  Tarasovich did not work on November 4, 2020 and were not present at ECP on that
  date; therefore, they had no involvement with the Arrington-Brown altercation.

ECF No. 39-6, ¶¶4-10.

### The Pending Rule 56 Motion

The Moving Defendants interpret Arrington's pleadings as stating a 14th Amendment

"deliberate indifference" claim against each of them and a 14th Amendment "failure to intervene

claim against Defendant Johnston specifically. The Moving Defendants contend that no

reasonable jury could find that any of them acted with deliberate indifference in the face of a

substantial risk of harm to Arrington. They further contend that the record does not support a

failure-to-intervene claim against Johnston. The Moving Defendants next argue that Arrington's

averments concerning a strip search, ridicule, and/or beratement fail to establish a plausible

constitutional claim. Finally, they assert that the claims against Defendants Beganics and Bolt

arising out of an alleged assault and strip search are time-barred.

Arrington responds that the Court's Rule 56 analysis should be limited to the Moving

Defendants' arguments related to the video footage. As to this evidence, Arrington contends that

the record does not support their request for a summary judgment. Arrington objects to the

Defendants' submission of an affidavit from ECP Deputy Warden Gary Seymour as procedurally

inappropriate, and he asks that the Court disregard it. He insists that some of the issues raised by

Defendants must be considered under a Rule 12(b)(6) analysis, as they were not within the scope

of the Court's conversion order.

## II.    Standard of Review

### A.  Rule 12(b)(6)

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the

legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In

deciding a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A court need not accept as true unsupported conclusions and unwarranted inferences. *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000). Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### B.  Rule 56

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claims elements. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (holding that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

Under this standard, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or

nonexistence would affect the outcome of the case under applicable substantive law. *Id.* at 248;

*Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is

"genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners

of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court

must view the record and all reasonable inferences to be drawn therefrom in favor of the

nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*,

963 F.2d 599, 600 (3d Cir. 1992). To avoid summary judgment, however, the nonmoving party

may not rest on the unsubstantiated allegations of their pleadings. Instead, once the movant

satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of

material fact, the nonmoving party must go beyond their pleadings with affidavits, depositions,

answers to interrogatories or other record evidence to demonstrate specific material facts that

give rise to a genuine issue. *Celotex Corp.*, 477 U.S. at 324. In this respect, "summary judgment

is essentially 'put up or shut up' time for the nonmoving party." *NRV Inc. v. Majestic Hills*, LLC,

2023 WL 3043780, at *3 (W.D. Pa. Apr. 21, 2023) (quoting *Berckeley Inv. Grp. v. Colkitt*, 455

F.3d 195, 201 (3d Cir. 2006)).

### III.    Discussion

Arrington asserts his claims pursuant to 42 U.S.C. §1983, which provides a private right

of action against "[e]very person who, under color of any statute, ordinance, regulation, custom,

or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or

other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws" of the United States.  To state a viable claim under this statute, Arrington must show that a person, while acting under color of state law, violated a right guaranteed to him by the U.S. Constitution or federal law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).

To establish a defendant's personal liability under Section 1983, a plaintiff must allege facts that show the defendant's personal involvement in the alleged misconduct. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988*); see Verticelli v. Commonwealth of Pa. Dep't of Corrs.*, No. 25-CV-1463, 2025 WL 1426082, at *2 (E.D. Pa. May 15, 2025) (noting that a Section 1983 plaintiff "must allege how each defendant was involved in the events and occurrences giving rise to the claims"). Personal involvement may be shown if an officer directly engaged in the alleged misconduct, or personally directed it, or had actual knowledge of the misconduct and acquiesced in it.  *Rode*, 845 F.2d at 1207; *see also Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020).

Because each of the ECP Defendants acted under color of state law, the only question is whether Arrington can establish each Defendant's personal involvement in a violation of his federally guaranteed rights.  Here, Arrington claims that his rights under the Fourteenth Amendment were violated while he was a pretrial detainee at ECP.

Under the Fourteenth Amendment, a state court pretrial detainee may not be subjected to conditions that would amount to punishment, since there has been no adjudication of guilt.  *See Hubbard v. Taylor ("Hubbard II")*, 538 F.3d 229, 231 (3d Cir. 2008) (quoting *Bell v. Wolfish*, 441 U.S. 420, 535 (1979)).  The touchstone for constitutionality is whether the conditions of the pretrial detainee's confinement are meant to punish or are merely "an incident of some other legitimate governmental purpose." *Hubbard II*, 538 F.3d at 232 (quoting *Bell*, 441 U.S. at 538-

39). "[T]he ultimate question" is whether the conditions are "reasonably related to a legitimate governmental objective." *Id.* at 236 (quoting *Bell*, 441 U.S. at 549). If they are not, "we may infer 'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees.'" *E.D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (quoting *Hubbard II*, 538 F.3d at 232). The court must "consider the totality of the circumstances of confinement, including any genuine privations or hardship over an extended period of time, and whether conditions are (1) rationally related to their legitimate purpose or (2) excessive in relation to that purpose." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 326 (3d Cir. 2020) (citing *Hubbard v. Taylor ("Hubbard I")*, 399 F.3d 150, 159–160 (3d Cir. 2005)). Courts must also acknowledge that "practical considerations of detention justify limitations on 'many privileges and rights,'" and "a detainee 'simply does not possess the full range of freedoms of an unincarcerated individual.'" *Hope*, 972 F.3d 310, 326 (3d Cir. 2020) (quoting *Bell*, 441 U.S. at 545-46).

A fair reading of Arrington's supplement to the Amended Complaint suggests that he is alleging at least five (5) different instances of unconstitutional conduct in relation to his pretrial confinement. These allegedly occurred (a) around the time of his initial arrival at ECP; (b) during an encounter with Defendant Beganics on October 4, 2020; (c) upon his assignment to a shared cell with Inmate Damien Brown (and continuing thereafter up until the November 4, 2020 assault); (d) during the November 4, 2020 assault by Brown; and (e) upon issuance of an allegedly false misconduct report. The Court will address each instance of alleged misconduct in turn.

A. *Alleged Violations Occurring At or Around the Time of Plaintiff's Arrival at ECP*

In his supplemental pleading, Arrington claims that "[o]n or about July 2, 2020, . . . when the Plaintiff was being escorted into the Erie County Prison by two officers," Beganics "loudly ridiculed [and] insulted" him and also "exhibited knowledge of the videotape and other evidence that were not available onto [sic] the public." ECF No. 20, ¶4(c). Arrington similarly alleges that, shortly after he was brought to ECP on July 2, 2020, Bolt "strip searched and berated the Plaintiff" and "otherwise ridiculed and tried to intimidate the Plaintiff during and after the strip search." *Id.* ¶5(a).

The Court will address these allegations under the standard applicable to motions to dismiss, as this aspect of Defendants' Rule 12(b)(6) motion was not converted into a Rule 56 motion for summary judgment. Applying that standard of review, the Court finds that Arrington has failed to state a plausible constitutional claim.

Numerous courts have held that threats, insults, and/or belittling language toward an inmate or pretrial detainee do not, without more, amount to a constitutional deprivation. *See, e.g., Gibson v. Flemming*, 837 F. App'x 860, 863 (3d Cir. 2020) (*per curiam*) (plaintiff's allegations "that an officer winked at him and 'flicked his tongue' at [him]" did not state a constitutional violation); *Horst v. Litz*, No. 1:23-CV-00917, 2023 WL 4827077, at *4 (M.D. Pa. July 27, 2023) (plaintiff's allegations that corrections officers "cuss and yell at inmates" was insufficient to state a Section 1983 claim because "conduct like verbal harassment, taunting, and use of profanity, without any injury or threat thereof, is insufficient to implicate a constitutional infringement under either the Eighth or Fourteenth Amendment"); *King v. Quigely*, No. 18-3420, 2018 WL 4702168, at *3 (E.D. Pa. Sept. 28, 2018) (dismissing claim that officers violated plaintiff's constitutional rights by verbally harassing him with sexual comments, because

"[a]llegations of verbal abuse or threats, unaccompanied by injury or damage, are not cognizable under §1983, regardless of whether the inmate is a pretrial detainee or sentenced prisoner") (citation omitted; alteration in the original); *Graham v. Main*, No. 10-cv-5027(SRC), 2011 WL 2412998, at *24-25 (D.N.J. June 9, 2011) (same) (collecting cases). Accordingly, Arrington fails to state a plausible §1983 claim based on allegations that Beganics and/or Bolt ridiculed, insulted, berated, or otherwise tried to intimidate him.

Similarly, no constitutional violation arises from Beganics "exhibit[ing] knowledge of the videotape and other evidence" that was not available to the general public. There is no allegation here that Beganics was involved in the decision to charge Arrington with criminal offenses, so Beganics cannot be liable under a malicious prosecution theory. Thus, at bottom, Beganics' alleged conduct is simply another form of ridicule or harassment. Although unfortunate and misguided (if proven), it does not amount to a constitutional violation.

As for Bolt's involvement in performing a strip search, case law establishes that "not all strip searches of pre-trial detainees are improper[.]" *Stevenson v. Perry*, No. CV 25-14116 (KMW) (MJS), 2025 WL 2879790, at *2 (D.N.J. Oct. 8, 2025). Rather, "the Supreme Court has held that an initial strip search upon entry into general population and strip searches conducted for cause pass constitutional muster; it is generally only frequent strip searches without sufficient cause which will violate a prisoner's rights." *Id.* at *2 (citing *Florence v. Bd. Of Chosen Freeholders of Cnty. Of Burlington*, 566 U.S. 318 (2012); *Parkell v. Danberg*, 833 F.3d 313, 327-30 (3d Cir. 2016)); *see also Gorrio v. Briggs*, No. 1:23-CV-01697, 2025 WL 2177826, at *25 (M.D. Pa. July 31, 2025) (no constitutional violation stated where plaintiff did not allege any facts supporting an inference that his strip search for contraband was unreasonable); *McDowell v. Deparlos*, No. 15-cv-00487, 2017 WL 1158093, at *10 (M.D. Pa. Feb. 2, 2017) ("[I]t is well

established that a visual strip search of a pretrial detainee, even if without reasonable suspicion that a particular inmate sought to conceal contraband, does not violate the Fourteenth Amendment.") (citing *Florence*, 566 U.S. 318 (2012) and *Langella v. County of McKean*, No. 09-cv-00311, 2010 WL 3824222, at *11–12 (W.D. Pa. Sept. 23, 2010)), *report and recommendation adopted*, 2017 WL 1134407 (M.D. Pa. Mar. 27, 2017). Here, Arrington does not allege that he was subjected to repeated or prolonged strip searches, nor does he allege a lack of cause for the strip search or any other circumstances that would suggest the search was unreasonable. Thus, no constitutional violation can be inferred from the mere fact that Arrington was subjected to a strip search shortly after entering ECP, even if he was subjected to berating or insulting language at the same time.

For these reasons, Arrington has not stated a plausible Fourteenth Amendment violation based on the Defendants' conduct at or around the time he initially entered ECP.

B.  *Alleged Violations Occurring on October 4, 2020*

In his supplement to the Amended Complaint, Arrington avers that Defendant Beganics assaulted him "by shoving his head into the wall and forcefully pushing his face into the wall" during an incident that occurred on October 4, 2020. ECF No. 20, ¶4(b). In his Rule 56 affidavit, Arrington states only that, sometime prior to November 4, 2020, he was transported to the RHU by Defendants Tarasovich, Johnston, and Beganics. ECF No. 44, ¶4. He asserts that he was treated "roughly" and forced to undergo a strip search. During this incident Beganics allegedly forced Arrington's head against a wall.

Arrington previously agreed to the dismissal of his assault claim against Beganics when responding to the ECP Defendants' initial Rule 12(b)(6) motion. *See* ECF No. 29 at 3.

Moreover, Arrington makes no attempt to rehabilitate this part of his §1983 claim in his brief in opposition to the pending motion.  Accordingly, the Court deems this claim abandoned.

Even if it was not abandoned, however, this claim cannot withstand a Rule 12 or Rule 56 analysis.  As discussed, the mere fact that Arrington was subjected to a strip search upon admission to the RHU does not give rise to a plausible constitutional violation.  And while a pretrial detainee may assert a Fourteenth Amendment claim based on an official's use of excessive force, *see Kingsley v. Hendrickson*, 576 U.S. 389 (2015), no such claim has been stated here.

"To state a due process violation based on excessive force, a pretrial detainee must allege plausibly that 'that the force purposely or knowingly used against him was objectively unreasonable.'" *Williams v. Miller*, No. 25-CV-6293, 2026 WL 209815, at *7 n.11 (E.D. Pa. Jan. 27, 2026) (quoting *Kingsley*, 576 U.S. at 396-97).  "Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.  The court cannot apply this standard "mechanically," as "objective reasonableness turns on the facts and circumstances of each particular case." *Id.* (citations and internal quotation marks omitted).  Further, the court must "make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (citation omitted). Finally, courts "must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to

policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (cleaned up).

Here, Arrington's allegation of "rough" treatment, without more, does not rise to the level of a plausible Fourteenth Amendment. Though it raises the *possibility* of a Fourteenth Amendment violation, it is insufficient to "nudge" his claim "across the line from conceivable to plausible." *In re Walmart Inc. Sec. Litig.*, 151 F.4th 103, 112 (3d Cir. 2025) (citation omitted); *see also Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'") (quoting Fed. Rule Civ. Proc. 8(a)(2)) (alteration in the original).

Arrington's allegation that Beganics forced his head or face into a wall in connection with the strip search likewise fails to state a plausible violation. He alleges no injury from Beganics' conduct and both his pleading and affidavit are devoid of any content that would otherwise reveal Beganics' conduct to be objectively unreasonable. At most, Arrington has pled a *possible*, but *not plausible*, constitutional tort. And his affidavit does not evidence the existence of a genuinely disputed issue regarding whether excessive force was used in this case.

Accordingly, even if not abandoned, these aspects of Arrington's Fourteenth Amendment claim are deficient as a matter of law. Accordingly, the Court will dismiss Arrington's §1983 claim to the extent it asserts a Fourteenth Amendment violation based on the alleged October 4, 2020 incident.

C. *Alleged Violations Predicated on Arrington's Placement in a Cell with Inmate Damien Brown (and Continuing Thereafter Until the November 4, 2020 Assault)*

Arrington alleges in his supplemental pleading that Defendants Beganics, Bolt, and Tarasovich failed to protect him by placing him in the same cell as Brown, despite Arrington expressing fears about his own safety if he were housed with Brown. In his affidavit, he identifies Johnston as also being involved in his cell assignment.

Pretrial detainees have a right under the Fourteenth Amendment to "security from physical assault by fellow prisoners." *Hightower v. City of Phila.*, 130 F. 4th 352, 356 (3d Cir. 2025) (internal quotation marks and citation omitted). "Thus prisons have a duty to protect inmates from other inmates' violence." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). A prison violates that duty if it (1) creates conditions that pose a substantial risk of serious harm and (2) is deliberately indifferent to inmate health or safety. *Id.* (quoting *Farmer*, 511 U.S. at 834). It is not settled in this circuit whether the "deliberate indifference" prong involves a subjective or objective standard in the pretrial detainee context. *See id.* (discussing case law from other circuits).

Here, Moving Defendants implicitly argue in favor of a subjective standard. They insist there is insufficient evidence to support a Fourteenth Amendment deliberate indifference claim in this case because Arrington has not asserted specific information about the subjective awareness of the officers involved in his cell assignment.

Presently, the Court will address Arrington's claim under the standard applicable to Rule 12(b)(6) motions. Arrington contends he was not on notice that this specific issue was to be part of the Rule 56 disposition and, therefore, has not had a fair opportunity to conduct discovery on this point. Arrington's position is well-taken, as the ECP Defendants initially sought to introduce evidence limited to bodycam footage recorded on November 4, 2020, the date of Brown's

alleged assault on Arrington.  The Court converted the ECP Rule 12(b)(6) motion after allowing

this evidence into the record.  Arrington's counsel later sought an extension of discovery for the

purpose of investigating whether additional footage might be available concerning the events of

November 4, 2020.  Arrington maintains there might be other discoverable information that may

shed light on whether the ECP Defendants subjectively knew Brown to present a substantial risk

of harm.  At the time that Arrington responded to the pending motion, there had not yet been an

exchange of Rule 26 initial disclosures, much less full-blown discovery.  Accordingly, it is

premature to adjudicate Arrington's failure-to-protect claim under a Rule 56 standard.

Applying the Rule 12(b)(6) standard of review to Arrington's claim, the Court finds that

the claim currently states a plausible basis for recovery under Section 1983.  Arrington's

supplement to the Amended Complaint states that Lt. Bolt participated in moving him to the cell

with Inmate Brown, despite Arrington "repeatedly requesting that he not be placed in a cell with

Mr. Brown and that his life would be in danger if he was placed in that cell." ECF No. 20, ¶5(b).

Arrington further claims that he "specifically requested" that Officer Tarasovich "not ... place

him in a cell with Mr. Brown for fear of his life."  *Id.* ¶6(a).  Nevertheless, "Officer Tarasovich

ignored this and placed [Arrington] in the cell with Mr. Brown despite there being an empty cell

right next to Mr. Brown's cell where he could have safely been housed."  *Id.*  For present

purposes, these allegations are sufficient to establish the deliberate indifference of Lt. Bolt and

Officer Tarasovich, even if a subjective standard applies.

Arrington's claim against Defendant Beganics stands on a different footing, however.  In

his supplemental pleading, Arrington offers only a conclusory averment that "Officer Beganics

failed to protect the Plaintiff from an assault that occurred while the Plaintiff was in the custody

of Erie County Prison." ECF No. 20, ¶4(a).  This is insufficient to state a viable basis for relief

under federal pleading standards. *See Doug Grant, Inc.*, *supra*, 232 F.3d at 174 (court need not accept unsupported conclusions and unwarranted inferences as true). Nor does Arrington's affidavit supply any further content regarding Beganics. In it, Arrington states only that he "know[s] that each of the officers listed as Defendants were well aware that inmate Brown was very violent, racist and very prone to fighting and physical harm to others." ECF No. 44, ¶2. This type of conclusory averment is insufficient to establish Officer Beganics' deliberate indifference to a substantial risk of serious harm.

As for Defendant Johnston, Arrington does not allege in his supplemental pleading that Johnston was personally involved in placing Arrington in the cell with Inmate Brown. *See* ECF No. 20, ¶7(a) and (b) (alleging only that Johnston failed to intervene in the November 4, 2020 assault and that Johnston later wrote up a false misconduct report against Arrington). By contrast, he does allege Johnston's involvement in his Rule 56 affidavit. *See* ECF No. 44, ¶¶5, 7, 8, 9. Arrington also alleges that he "specifically told Officers Johnston and Tarasovich that I feared for my life and my safety and that I would be beaten and assaulted if I was placed in the cell with [Inmate Brown]." *Id.* ¶7. Because Arrington has stated a plausible basis for Johnston's personal involvement in an alleged Fourteenth Amendment violation, the Court will allow him to an opportunity to amend his supplemental pleading in this regard. Arrington will need to submit this amendment within the time frame set forth in the Order that accompanies this Memorandum Opinion.

In sum, Arrington's Fourteenth Amendment claim predicated on his placement in a cell with Inmate Brown will proceed as it relates to Defendants Bolt and Tarasovich. Arrington will be given an opportunity to amend that claim as it relates to Defendant Johnston. To the extent Arrington has a good faith basis for alleging that Beganics was personally involved in housing

him with Inmate Brown and that Beganics was deliberately indifferent to the risk of harm that

this cell assignment posed, Arrington may include such additional factual content in his amended

pleading (if any).

### D. Alleged Violations Occurring During the November 4, 2020 Assault by Brown

Arrington alleges in his supplemental pleading that Johnston "stood and witnessed the

assault by Damien Brown" and "did nothing to stop the assault. [Johnston] allowed Mr. Brown

to repeatedly assault Plaintiff and bang his head off the concrete wall and floor." ECF No. 20,

¶7(a). Arrington adds in his Rule 56 affidavit that he was ordered to "get down on the ground"

while Brown continued his assault. ECF No. 44, ¶12. Arrington states that he had to "rise up

and try to control" Brown for a period of about 45 to 50 seconds while Johnston "stared into the

cell with a grin on his face and allow[ed] the assault to continue." *Id.* Then, once both Arrington

and Brown were on the ground and the assault had ended, the cell door was opened, and

Arrington was moved to the other side of the RHU. *Id.* ¶13.

"Whether raised by a pretrial detainee under the Fourteenth Amendment or a convicted

prisoner under the Eighth Amendment, a corrections officer's failure to intervene in a beating can

be the basis of liability ... under § 1983 if the corrections officer had a reasonable opportunity to

intervene and simply refused to do so[.]" *Gorrio v. Briggs*, No. 1:23-CV-01697, 2025 WL

2177826, at *26 (M.D. Pa. July 31, 2025) (cleaned up); *see Smith v. Mensinger*, 293 F.3d 641,

650-51 (3d Cir. 2002) ("[A] police officer has a duty to take reasonable steps to protect a victim

from another officer's use of excessive force," but only "if there is a realistic and reasonable

opportunity to intervene."). To prevail on a failure-to-intervene claim, "a plaintiff must show:

(1) that the defendant failed or refused to intervene when a constitutional violation took place in

his or her presence or with his or her knowledge; and (2) there was a realistic and reasonable

opportunity to intervene." *Balliet v. Luzerne County*, No. 22-cv-02032, 2024 WL 2275252, at *8 (M.D. Pa. May 20, 2024) (citations and internal quotation marks omitted). "Naturally enough, the duration of the incident is key to determining whether there was a reasonable opportunity [to intervene]." *El v. City of Pittsburgh*, 975 F.3d 327, 335 (3d Cir. 2020). "[W]here an incident is momentary, its 'brevity' may 'defeat[ ] [a] ... failure-to-intervene claim.'" *Id.* (first alteration added)(quoting *Ricks v. Shover*, 891 F.3d 468, 479 (3d Cir. 2018) (no failure-to-intervene claim against a prison supervisor where a guard allegedly made brief sexual contact with an inmate, which had ended by the time the inmate called for help)). On the other hand, "[t]here may be a genuine issue of fact regarding a reasonable opportunity to intervene where the allegedly excessive force lasts about fifteen minutes, . . . or where the event unfolds in multiple stages[.]" *Id.* (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) and *Smith*, 293 F.3d at 644, 650).

The Court will review Arrington's failure-to-intervene claim under the standards applicable to Rule 56 motions, because the ECP Defendants supplemented their initial motion to dismiss this claim with video footage, which led the Court to convert that aspect of the Rule 12(b)(6) motion into a Rule 56 motion. The relevant Rule 56 evidence consists primarily of video footage recorded by Defendant Johnston's and Defendant Bolt's body cameras, along with Arrington's affidavit. Although the body cam footage recorded by Johnston is not totally comprehensive regarding the details of the assault, it is the best evidence of Johnston's conduct relative to the incident, and it refutes Arrington's allegations that Johnston simply "stood and witnessed the assault," "did nothing to stop" it, and/or "allowed" it to continue.

Instead, the video shows that Johnston proceeded to Arrington's cell to investigate what sounds on the video like an argument. Once he arrived and witnessed the altercation, he

promptly summoned other staff to the scene and then immediately and repeatedly instructed the cellmates to stop fighting while he awaited assistance. Once the second officer arrived and the cell was opened, Johnston entered and handcuffed Brown who, by that time, was separated from Arrington. Viewing all evidence, including the video footage, in the light most favorable to Arrington, no reasonable jury could find that Defendant Johnston violated Arrington's Fourteenth Amendment rights by failing to intervene in a more aggressive or timely manner.

E.  *Alleged Violations Occurring in Connection with an Allegedly False Misconduct Report Issued by Defendant Johnston*

In his supplement to the Amended Complaint, Arrington alleges that, when he "complained about the fact that Officer Johnston did nothing to prevent the assault" by Inmate Brown, Johnston responded by issuing "false misconduct reports" that were "intentionally designed to make Mr. Arrington's prison stay more difficult and more unsafe." ECF No. 20, ¶7(b). After careful review of the Rule 56 filings, the Court does not perceive that this aspect of the pleading was specifically addressed by the Moving Defendants' motion. Accordingly, the Court will not address the sufficiency of this claim at the present time.

## IV.    Conclusion

Based upon the foregoing reasons, the Moving Defendants' motion for summary judgment will be granted with respect to Arrington's Fourteenth Amendment failure-to-intervene claim against Defendant Johnston. In addition, the Court will dismiss with prejudice those Fourteenth Amendment claims that are predicated on: Officer Beganics allegedly assaulting Arrington on or around October 4, 2020; Lt. Bolt strip searching Plaintiff on or around July 2, 2020; and Lt. Bolt and Officer Beganics allegedly insulting, ridiculing and/or intimidating Arrington on or around July 2, 2020. The Court will also dismiss the Fourteenth Amendment

claims predicated on Officers Johnston and Beganics placing Arrington in the same cell as Inmate Brown, but Arrington will be given leave to amend those claims to the extent he can do so consistent with his obligations under Rule 11 of the Federal Rules of Civil Procedure. Defendants' motion will be denied insofar as it relates to the Fourteenth Amendment claims predicated on Lt. Bolt or Officer Tarasovich placing Arrington in the same cell as Inmate Brown. In addition to these claims surviving and proceeding in the litigation, Arrington's claim against Officer Johnston based on an alleged false misconduct report will likewise remain in the case at this juncture.

  An appropriate Order follows.


            *Susan Paradise Baxter*

            SUSAN PARADISE BAXTER
            United States District Judge